APR 22 2026 PM1:10
FILED-USDC-CT-NEW_HAVEN

DOCUMENT 2

# VERIFIED COMPLAINT

*DRAFT — EXHIBIT A TO DEMAND LETTER — NOT YET FILED*

# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

---

# [DRAFT — EXHIBIT A TO PRE-LITIGATION DEMAND LETTER — NOT YET FILED]

---

| | |
|---|---|
| **SANFORD B. SCHUPPER,** | |
|     Plaintiff, | |
| v. | Civil Action No. _____ |
| **MATTERPORT, LLC; COSTAR GROUP, INC.;** | |
| and DOES 1 through 20, inclusive, | |
|     Defendants. | |

---

## JURY TRIAL DEMANDED

---

## VERIFIED COMPLAINT

Plaintiff Sanford B. Schupper, proceeding pro se, hereby files this Verified Complaint against Defendant Matterport, LLC, and alleges as follows:

---

## NATURE OF THE ACTION

This is a civil action arising from Defendant Matterport, LLC's bad-faith termination of Plaintiff's long-standing subscription contract, its fraudulent inducement of Plaintiff into an approximately eight-year commercial relationship through promises it never intended to keep, and its refusal to reinstate Plaintiff's contractual rights despite Plaintiff's complete cure of an autopayment failure within twenty-four hours of termination. At its core, this case is about a powerful technology company — recently acquired by a NASDAQ-listed real estate data giant — deliberately exploiting a technical, immediately-remedied payment default to accomplish what it had attempted, and publicly retracted, just fourteen months earlier: the forced elimination of legacy pricing for its earliest and most loyal Service Partners. Plaintiff — a seventy-seven-year-old service-connected disabled Vietnam combat veteran with established short-term memory and cognitive impairments — invested approximately eight years of time, money, and professional identity building a small real estate photography business on Matterport's platform, in direct reliance on Matterport's express promises. Matterport now seeks to take that reliance and use it as a lever to extract three to six times the monthly subscription rate Plaintiff was promised and has paid for approximately eight years. Plaintiff seeks injunctive relief, compensatory damages, restitution, punitive damages, and such other relief as this Court deems just and proper.

## PARTIES

**1.** Plaintiff Sanford B. Schupper ("Plaintiff" or "Mr. Schupper") is an individual residing at 23 Old Bridge Road, Brookfield, Connecticut 06804. Plaintiff is a citizen of the State of Connecticut for purposes of 28 U.S.C. § 1332. Plaintiff is seventy-seven (77) years of age, born May 27, 1948, and will turn seventy-eight (78) years of age on May 27, 2026.

**2.** Plaintiff is a service-connected disabled veteran of the United States Army who served in the Vietnam War as a combat soldier. Plaintiff volunteered for Vietnam service and served as a United States Army Specialist 4, enlisted, bearing Service Number RA11839596. Plaintiff's military service has resulted in service-connected disabilities, including severe short-term memory impairment and moderate loss of cognitive executive skills, which are relevant to the circumstances of the payment default alleged herein.

**3.** Plaintiff is a certified paralegal. Plaintiff operates a small real estate photography business under the trade name "Brookfield Photographer" at the website brookfieldphotographer.com, with business email brookfieldphotographer@gmail.com. Plaintiff operates this business from his residence at 23 Old Bridge Road, Brookfield, Connecticut 06804. Plaintiff's telephone number is (203) 941-0230.

**4.** Defendant Matterport, LLC ("Defendant" or "Matterport") is a Delaware limited liability company with its principal place of business at 430 W California Avenue, Sunnyvale, California 94086. Matterport is a citizen of the State of Delaware (state of formation) and the State of California (principal place of business) for purposes of 28 U.S.C. § 1332. Matterport is wholly owned by CoStar Group, Inc. (NASDAQ: CSGP), a publicly traded real estate data and analytics company headquartered in Washington, D.C. Matterport operates a cloud-based platform for creating, hosting, and sharing three-dimensional digital twin environments, as more fully described herein.

**4a.** CoStar Group, Inc. (NASDAQ: CSGP) is named as a defendant in this action as the parent company and sole owner of Defendant Matterport, LLC. CoStar directed, controlled, ratified, or was the proximate beneficiary of the wrongful conduct alleged herein. CoStar's General Counsel Gene Boxer has been a recipient of all formal pre-litigation notices transmitted by Plaintiff. CoStar is a citizen of the State of Virginia (principal place of business) and the State of Delaware (state of incorporation) for purposes of 28 U.S.C. § 1332.

**5.** Defendants Does 1 through 20, inclusive, are individuals and/or entities whose identities and roles are presently unknown to Plaintiff but who are believed to have participated in, directed, approved, or ratified the wrongful conduct alleged herein, including but not limited to: (a) Matterport officers, directors, or employees who made or approved the decision to terminate Plaintiff's legacy plan and to refuse reinstatement; (b) CoStar officers, directors, or employees who directed the strategy of eliminating legacy subscriber pricing; (c) third-party billing processors or platform vendors whose systems caused or contributed to the payment failure of February 22, 2026; and (d) any other person or entity whose identity may be discovered through litigation. Plaintiff will seek leave to amend this Complaint to identify each Doe defendant when their identity becomes known through discovery.

**4a.** CoStar Group, Inc. is believed to be represented in this matter by its in-house General Counsel and Corporate Secretary, Gene Boxer. Mr. Boxer is a necessary fact witness in this action: he possesses direct knowledge of CoStar's acquisition of Matterport, CoStar's corporate policies regarding legacy plan subscribers, and the decision-making process leading to Plaintiff's cancellation and refusal of reinstatement. Under Rule of Professional Conduct 3.7, a lawyer who is a necessary fact witness cannot serve as trial counsel in the same matter. Accordingly, Mr. Boxer is disqualified from entering an appearance in this action on behalf of Defendant. CoStar and Matterport must retain outside counsel. D. Conn. L. Civ. R. 83.1(d) requires that such outside counsel be a member of the Bar of the District of Connecticut, or be admitted pro hac vice with Connecticut-admitted local co-counsel of record.

## JURISDICTION AND VENUE

**5.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between Plaintiff, a citizen of Connecticut, and Defendant, a citizen of Delaware and California. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, as more fully set forth herein.

**6.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District. Specifically: (a) Plaintiff's business, Brookfield Photographer, is operated from Brookfield, Connecticut; (b) the subscription contract between Plaintiff and Matterport was performed in substantial part in Connecticut, where Plaintiff created, uploaded, and managed the Spaces at issue; (c) the photography services that generated the approximately 200 Spaces at issue were provided in Connecticut; (d) Plaintiff has suffered all harm alleged herein in Connecticut; and (e) the threatened loss of Plaintiff's business portfolio would be felt entirely within Connecticut.

**7.** Simultaneously with or immediately following the filing of this Complaint, Plaintiff intends to file a motion for a Temporary Restraining Order and Preliminary Injunction to preserve the status quo pending resolution of this action.

**7a.** Personal jurisdiction over Defendant Matterport, LLC in this District is proper pursuant to the Connecticut long-arm statute, Conn. Gen. Stat. § 33-929, which extends to any entity that transacts business within Connecticut, commits a tort within Connecticut, or otherwise has minimum contacts with Connecticut sufficient to satisfy the requirements of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny. *See Walden v. Fiore*, 571 U.S. 277 (2014). Matterport actively marketed its Service Partner program to Connecticut residents, contracted with Plaintiff in Connecticut, provided subscription services to Plaintiff in Connecticut for eight years, and the upload restriction, forced

upgrades, and business disruption at issue all occurred within the State of Connecticut. Matterport has purposefully availed itself of the Connecticut market and has substantial minimum contacts with this forum.

**7b.** Plaintiff specifically objects to any motion to transfer venue to the Northern District of California or any other distant forum. Plaintiff is a seventy-seven-year-old service-connected disabled combat veteran suffering from PTSD and severe short-term memory impairment. Travel from Brookfield, Connecticut to San Jose or San Francisco, California — a distance of approximately 2,800 miles — would impose an extraordinary physical and psychological hardship on Plaintiff that Defendant cannot credibly claim to suffer in any comparable degree. Defendant's principal offices are located at 1201 Wilson Boulevard, Arlington, Virginia — accessible to Defendant's parent company CoStar Group, Inc. by automobile or train from Washington, D.C. — and Defendant's counsel can travel to the District of Connecticut without material hardship. Plaintiff invokes all applicable protections for his disability and veteran status in opposing any transfer motion. *See Atlantic Marine Construction Co. v. U.S. District Court*, 571 U.S. 49 (2013) (venue transfer analysis).

## FACTUAL ALLEGATIONS

### I. Matterport's Business

8. Matterport operates a cloud-based platform that enables users to create, host, and share three-dimensional digital twin "Spaces" — immersive virtual representations of real-world interior environments. Using Matterport's proprietary cameras and software, photographers and service partners capture physical spaces in high resolution and upload the resulting data to Matterport's cloud platform, where the data is processed, rendered into an interactive three-dimensional model, and hosted for viewing by end users.

9. Matterport's platform is used extensively in real estate, architecture, construction, insurance, hospitality, and related industries. Matterport's three-dimensional Spaces are widely used for real estate listings, virtual property tours, and construction documentation, among other commercial applications.

10. Matterport offers both proprietary camera hardware — including its Pro 2 and Pro 3 camera systems — and cloud-based subscription software. The cameras capture and upload spatial data that is hosted and made accessible through Matterport's subscription platform. The cameras have no meaningful commercial utility without an active Matterport subscription, as the processing, hosting, and sharing of Spaces is entirely dependent on access to Matterport's cloud platform.

11. Matterport was recently acquired by CoStar Group, Inc. (NASDAQ: CSGP), one of the world's largest providers of commercial real estate data, analytics, and online marketplaces. CoStar Group operates numerous online real estate platforms, including Homes.com, CoStar, LoopNet, and others. Following the acquisition, Matterport became a wholly owned subsidiary of CoStar Group, operating as Matterport, LLC.

12. To expand its network of photographers and service providers, Matterport established a "Service Partner" program through which independent photographers, real estate professionals, and other small business operators were

recruited to use Matterport's cameras and platform to provide three-dimensional imaging services to real estate and other clients, thereby expanding Matterport's market reach and use of its platform.

## II. Matterport's Solicitation and Fraudulent Inducement of Plaintiff (Beginning February 2018)

13. Beginning in February 2018, approximately eight years before the filing of this Complaint, Matterport's representatives actively solicited Plaintiff to become a Matterport Service Partner and to adopt Matterport's technology as the foundation of his real estate photography business. Google Voice records preserved in Plaintiff's email archive confirm that Brad Ewert, a Matterport employee (email: bewert@matterport.com; direct phone: (415) 851-4404), personally called Plaintiff on February 1, 2018 at 4:32 PM to initiate this solicitation. A second voicemail from Brad Ewert is dated February 15, 2019, confirming Ewert's continuing role as Matterport's representative in Plaintiff's account relationship. Brad Ewert is a key witness subject to deposition in this matter.

14. As a material inducement to Plaintiff's participation in the Matterport Service Partner program, Brad Ewert, acting on behalf of Matterport, expressly and specifically promised Plaintiff that Matterport would provide him with three to four (3 to 4) qualified business leads per month. These were not vague or aspirational statements; they were specific, affirmative promises of a concrete business benefit — namely, that Matterport would actively generate and refer paying business clients to Plaintiff to enable him to build and sustain a viable commercial photography business.

15. The promise of 3-4 qualified leads per month was a material term of the inducement. Plaintiff was, at the time of solicitation, a seventy-year-old disabled combat veteran with a limited business network and no pre-existing client base in the real estate photography sector. Without a reliable source of client referrals, the economics of investing in a $4,000 camera and a monthly subscription plan

would have been uncertain at best. The promised leads were the economic linchpin of the business opportunity Matterport represented.

16. In direct and reasonable reliance on Brad Ewert's and Matterport's promise of 3-4 qualified leads per month, Plaintiff made the following material investments:

> (a) Plaintiff purchased a Matterport Pro 2 camera for approximately Four Thousand Dollars ($4,000.00); and

> (b) Plaintiff subscribed to Matterport's legacy subscription plan (the "Legacy Plan"), as more fully described below, at a rate of approximately $62.62 per month.

17. At the time Brad Ewert and Matterport made the promise of 3-4 business leads per month, Matterport either knew the representation was false, had no intention of fulfilling it, or made the representation recklessly and without regard to its truth or falsity. The promise appears to have been a standardized recruiting representation used to enlist Service Partners at scale, without any operational infrastructure or commitment to deliver on the promised referrals.

18. Matterport never delivered a single qualified business lead to Plaintiff across the entire approximately eight-year duration of the parties' relationship. Not one lead. The promise of 3-4 leads per month was wholly illusory and was never honored in any month over the approximately ninety-six months of the parties' relationship.

18A. Google Voice records preserved in Plaintiff's email archive constitute documentary evidence of the February 2018 initial solicitation by Brad Ewert and confirm the commencement date of the parties' relationship. These records are available for production in discovery and, together with Brad Ewert's deposition testimony, are expected to establish the specific promises made during Matterport's sales solicitation.

19. Had Matterport disclosed, at the time of solicitation, that it would not be providing any business leads, Plaintiff would not have purchased the $4,000 Pro 2 camera, and would not have committed to the Legacy Plan subscription.

## III. The Legacy Plan

**20.** At or around the time of Plaintiff's enrollment as a Service Partner, Matterport offered Plaintiff a subscription to what is referred to herein as the "Legacy Plan" (also referred to by Matterport as its "Classic plan"). The Legacy Plan was a grandfathered subscription tier offered to early Service Partners and adopters as an incentive for early adoption of Matterport's platform.

**21.** The Legacy Plan entitled Plaintiff to host a substantial or unlimited number of Spaces on Matterport's cloud platform for a fixed monthly fee of approximately Sixty-Two Dollars and Sixty-Two Cents ($62.62). This flat-rate, high-capacity hosting arrangement was the core economic benefit of the Legacy Plan and was the primary consideration for Plaintiff's ongoing monthly subscription payments.

**22.** Over the approximately eight years of his subscription to the Legacy Plan, Plaintiff created, uploaded, and hosted approximately two hundred (200) distinct Matterport Spaces. These Spaces represent the totality of Plaintiff's professional portfolio as a real estate and commercial photographer — including virtual tours of real estate listings, commercial properties, client deliverables, and portfolio showcase materials.

**23.** Plaintiff's approximately 200 Spaces on the Matterport platform have accumulated a total of approximately 121,500 total views and approximately 69,100 unique visitors. These metrics reflect substantial commercial activity, meaningful public engagement, and significant economic value. Plaintiff's Spaces are not dormant or archival; they represent active, client-facing commercial deliverables.

**24.** Plaintiff established automatic payment for his Legacy Plan monthly subscription fee, authorizing Matterport to charge the $62.62 monthly fee to his payment method on a recurring basis.

**25.** On April 21, 2026, Plaintiff received a written complaint from a licensed Connecticut Real Estate Broker and Office Manager (identity redacted herein as

"Jane Doe" at the request of her family) whose real estate listing was directly harmed by Matterport's platform failures. Jane Doe's written complaint, attached hereto as **Exhibit Q**, confirms: (a) the Matterport scan was conducted April 12, 2026; (b) the walkthrough virtual tour was not delivered until April 17, 2026 — five days later; (c) the floor plan was not delivered until April 20, 2026 — more than a full week after the scan; (d) the floor plan contained multiple inaccuracies including incorrectly labeled rooms, requiring a corrected version the same day (an implicit admission of defect); (e) the listing property "missed a prime weekend for exposure, which has directly impacted buyer interest" and "may result in extended days on market and potentially a lower sale price"; and (f) the brokerage office "will no longer consider your company for future listing photography needs." The unredacted original is available for in camera review upon order of the Court.

26. Plaintiff's Legacy Plan subscription constituted a binding contract between Plaintiff and Matterport, under which Plaintiff was obligated to pay the monthly subscription fee and Matterport was obligated to provide continuous, uninterrupted hosting and access to Plaintiff's approximately 200 Spaces.

## IV. Pattern of Payment Issues and Established Practice of Resolution

26. Over the course of the approximately eight-year subscription relationship, Plaintiff's autopayment for the Legacy Plan occasionally failed to process. These instances were episodic and were invariably resolved through direct communication between Plaintiff and Matterport's customer service personnel, including Plaintiff's Matterport account contact, Susan Jose.

27. On each prior occasion of an autopayment failure, Matterport did not terminate Plaintiff's Legacy Plan. Instead, Matterport's customer service personnel communicated with Plaintiff, Plaintiff remedied the payment issue, and the subscription continued uninterrupted. This pattern established a course of dealing between the parties whereby occasional autopayment failures were treated as correctable administrative matters, not as grounds for termination.

28. The recurring pattern of communication and resolution concerning payment failures — rather than immediate termination — was consistent with the nature of the Legacy Plan relationship and reflected Matterport's own understanding that occasional autopayment failures by small business subscribers should be addressed through communication, not summary cancellation.

29. Consistent with the parties' established pattern, in January 2025 Matterport's accounts receivable department began contacting Plaintiff regarding Invoice #INV04445684 in the amount of $62.62, issued January 19, 2025. Joan Cuevas, a Matterport Accounts Receivable Specialist, sent a past-due notice to Plaintiff on or about January 24, 2025, when the invoice was five (5) days overdue, and a follow-up communication on or about February 4, 2025, when the invoice was sixteen (16) days overdue. This course of conduct further confirms Matterport's own practice of communication and follow-up for payment delays, rather than immediate termination.

## V. Matterport's History of Billing Errors and Accommodation

29A. Susan A. Jose, identified in Matterport's own communications as a Senior Credit and Collections Specialist at Matterport (email: sjose@matterport.com), personally managed Mr. Schupper's payment issues going back to at least July 2020. Ms. Jose is a key witness whose direct, hands-on handling of Plaintiff's account over multiple years establishes that Matterport's institutional practice — enforced at the collections-specialist level — was to work through payment method issues via direct communication rather than to terminate the account.

29B. In or about July 2020, Ms. Jose personally engaged with Mr. Schupper in an email thread with the subject line "Do you folks have a PayPal account?" In that thread, Ms. Jose worked directly with Mr. Schupper on updating his credit card information, offered to delete the card on file after charging it, and patiently awaited resolution of the payment matter. This documented accommodation is representative of the established institutional practice that Matterport abruptly abandoned in 2026.

**29C.** On or about May 1, 2020, Mr. Schupper emailed Ms. Jose and, critically, also carbon copied RJ Pittman (Rjpittman@matterport.com), then Chairman and CEO of Matterport, on an email with the subject line "Continued unauthorized use of my debit card." In that email, Mr. Schupper wrote, in substance: "Susan I left you voice mails and sent you emails explicitly stating that you were not authorized to make any charges to my debit card. Notwithstanding my specific instruction you charged well over a $1000 to my debit card yesterday or this morning. I'm going to file a complaint with the Better Business Bureau and I've notified my bank that these are unauthorized charges." Mr. Schupper threatened a BBB complaint and initiated bank disputes in response to Matterport's unauthorized charge. (*See* Exhibit H.)

**29D.** On or about May 16, 2023, RJ Pittman, signing as "Chairman and CEO, Matterport," personally emailed Mr. Schupper announcing the first Classic plan price increase since 2016. In that email, Mr. Pittman wrote: "Hi Sandy, You've been a customer with us for years and we're incredibly grateful for your business and support." The email further stated that Matterport was "providing a 30-day grace period before this price change takes effect." (*See* Exhibit I.)

## VI. The January 2025 Termination Threat and the Remley Promise

**30.** In or around January 27, 2025, Matterport sent mass email communications to holders of legacy/Classic subscription plans, including Plaintiff, stating that their accounts would be terminated beginning in or around February 2025. This communication caused immediate and widespread alarm throughout Matterport's Service Partner community.

**31.** The January 2025 mass termination notice was not an isolated administrative communication. It reflected a deliberate corporate strategy by Matterport — acting under new ownership by CoStar Group — to eliminate the legacy/Classic pricing tier that had been promised to early Service Partners, and to force those subscribers onto higher-priced current subscription plans, thereby generating substantially increased recurring revenue.

**32.** Matterport's attempted mass termination of legacy/Classic plans in January 2025 generated significant and documented industry-wide backlash. Service Partners publicly objected to the announced terminations, and the controversy became a matter of public record within the real estate photography and proptech communities.

**33.** On or about January 28, 2025, in direct response to the widespread backlash from the Service Partner community, Matterport's Chief Revenue Officer, Jay Remley, sent a written communication to Matterport's Service Partner community expressly addressing and retracting the threatened termination. In that communication, CRO Remley stated, in substance and in relevant part:

> *"Classic plans are NOT being canceled starting in February. We apologize for any confusion caused and assure you that your Classic plan remains unchanged."*

> *"As long as your payments are up to date, you will retain full access to your Classic plan."*

(These statements are collectively referred to herein as the "Remley Promise.")

**34.** Plaintiff received the Remley Promise in writing and relied upon it as a binding commitment by Matterport — delivered by Matterport's own Chief Revenue Officer — that Plaintiff's Legacy Plan would be preserved, continued, and remain unchanged, for as long as Plaintiff's payments were current.

**35.** The Remley Promise was a clear, definite, and unambiguous representation. It was not hedged, conditioned, or qualified in any material respect. Its operative condition — "as long as your payments are up to date" — is a straightforward payment-currency condition that Plaintiff satisfied in full, as set forth below.

**36.** Following the Remley Promise, Plaintiff continued to rely on the Legacy Plan as the contractual and operational foundation of his real estate photography business. Plaintiff continued to create and upload Spaces to the Matterport platform, continued to pay his Legacy Plan subscription fees, and refrained from

investigating or migrating to competing platforms, in direct reliance on Matterport's assurance that his Legacy Plan was secure.

37. In further reliance on the Remley Promise and the continuing availability of the Legacy Plan, Plaintiff invested in additional photography equipment, including a 360 X5 camera, to expand his Matterport-based service offerings. This investment was made on the reasonable assumption, grounded in the Remley Promise, that the Matterport platform would continue to be available to Plaintiff on Legacy Plan terms.

## VII. The February 2026 Payment Failure and Matterport's Termination

38. In February 2026, Plaintiff's automatic payment for his Legacy Plan monthly subscription fee of $62.62 failed to process. Upon information and belief, this failure was an autopayment processing error similar to those that had occurred on prior occasions and had been resolved without incident through the parties' established course of dealing.

39. Matterport sent the following sequence of past-due notices to Plaintiff regarding the February 2026 billing:

> (a) On or about February 25, 2026, Matterport sent Plaintiff a past-due notice informing him that his subscription would be cancelled on March 19, 2026 if the outstanding balance was not paid;

> (b) On or about March 5, 2026, Matterport sent Plaintiff a reminder notice, again warning of cancellation on March 19, 2026; and

> (c) On or about March 12, 2026, Matterport sent Plaintiff a final notice, again warning of cancellation on March 19, 2026.

40. Each of the three notices identified above specifically stated that cancellation would occur on March 19, 2026 — not immediately, and not on any date prior to March 19, 2026.

41. On March 19, 2026, Matterport cancelled Plaintiff's Legacy Plan subscription (the "Termination"). The Termination was based solely on the non-payment of

Invoice #INV04445684 (or the equivalent February 2026 billing), an amount of approximately $62.62.

**42.** Plaintiff acknowledges that the three notices set forth in Paragraph 39, above, were sent and that the March 19, 2026 cancellation date was communicated. Plaintiff's failure to timely respond to these notices was directly and substantially caused by his service-connected disabilities — specifically, his severe short-term memory impairment and moderate loss of cognitive executive skills — which constitute documented, service-connected medical conditions arising from his combat service in the Vietnam War. These cognitive impairments make it difficult for Plaintiff to track and manage administrative communications and deadlines in the ordinary course.

**43.** On March 20, 2026 — the day immediately following the Termination, and within twenty-four (24) hours of the cancellation — Plaintiff paid the full outstanding balance of Sixty-Two Dollars and Sixty-Two Cents ($62.62) in its entirety. Matterport confirmed receipt of this payment via its automated "Payment Accepted" email, Invoice #IN252455040405839, dated March 20, 2026.

**44.** Upon Plaintiff's payment on March 20, 2026, Plaintiff's account balance was reduced to zero. The payment default that had formed the stated basis for the Termination was fully and completely cured, within twenty-four (24) hours of the Termination.

**45.** A one-day payment default on an approximately eight-year subscription account — immediately cured upon notice — does not constitute a material breach of contract under any reasonable commercial standard, and is particularly immaterial given: (a) the parties' approximately eight-year course of dealing; (b) the historical pattern of payment processing delays being resolved through communication; (c) the de minimis amount at issue ($62.62); (d) the complete and immediate cure; and (e) the Remley Promise, which conditioned plan preservation only on payments being "up to date" — a condition Plaintiff satisfied the very next day.

## VIII. Matterport's Refusal to Reinstate the Legacy Plan and Forced Plan Change

**46.** Despite receiving full payment on March 20, 2026, Matterport refused to reinstate Plaintiff's Legacy Plan. Matterport did not offer Plaintiff a cure period, an opportunity to restore the Legacy Plan, or any accommodation in light of the immediate cure and the parties' approximately eight-year relationship.

**47.** Instead, Matterport unilaterally informed Plaintiff that his Legacy Plan was permanently cancelled and that he would be required to subscribe to one of Matterport's current subscription plans to regain access to his account and Spaces.

**48.** Matterport's current subscription plans are materially inferior to the Legacy Plan in the following respects:

> (a) Matterport's entry-level current plan ("Starter") allows hosting of only five (5) active Spaces per month for approximately $14-$15 per month — a plan plainly inadequate for a subscriber with approximately 200 existing Spaces;

> (b) Matterport's mid-tier and upper-tier plans capable of accommodating Plaintiff's approximately 200 Spaces range in price from approximately $200 to $400 per month — representing an increase of three to six times Plaintiff's Legacy Plan rate of $62.62 per month; and

> (c) Matterport's current plans contain hosting limits, Space caps, and other material restrictions that were absent from the Legacy Plan.

**49.** Faced with an imminent client shoot scheduled for April 12, 2026, and the risk of losing access to his account entirely, Plaintiff was economically coerced into purchasing Matterport's Starter Subscription plan at approximately $14.89 per month. This plan allows only five (5) active Spaces — utterly inadequate for Plaintiff's portfolio of approximately 200 Spaces.

**50.** As of April 9, 2026, Plaintiff's Matterport account dashboard reflected the following:

> (a) Account Subscription: Starter 5;

> (b) Active Space Usage: 91 of 5 (meaning 91 of Plaintiff's Spaces are in active status under a plan that allows only 5); and

> (c) A prominent account banner stating: "You have exceeded your Active Space Limit. Archive Spaces or upgrade to upload more."

**51.** The dashboard conditions described in Paragraph 50 mean that ninety-one (91) of Plaintiff's approximately 200 Spaces are at immediate and imminent risk of being archived, made inaccessible to clients, or permanently deleted by Matterport. If Matterport takes such action, Plaintiff will lose the entirety or a substantial portion of his approximately eight-year professional portfolio — permanently and irreversibly.

**52.** On April 10, 2026, Matterport sent Plaintiff a "reactivation" email. However, this reactivation was not a reinstatement of the Legacy Plan; it was merely confirmation of Plaintiff's enrollment in the inferior Starter 5 plan. The reactivation email offered no meaningful relief and did not address the Legacy Plan.

**53.** To restore access to his full portfolio of approximately 200 Spaces on Matterport's current plan structure, Plaintiff would need to subscribe to a plan costing approximately $200 to $400 per month. For a one-person small business operated by a seventy-seven-year-old disabled veteran, this cost increase is financially untenable and would effectively destroy the economic viability of Plaintiff's business.

**53A.** Matterport's own billing system contributed to or caused the February 2026 payment failure. Matterport Support Agent "Geoff," in a written communication dated March 23, 2026, confirmed: "the account has the credit card number that ends in *4264 and it was refused on Feb 22, 2026." However, Plaintiff had a second valid payment card ending in *9395 set up on autopay, as confirmed in

Plaintiff's own email to Matterport dated March 21, 2026: "I have since double checked and it IS set to automatically charge 9395." Matterport's billing system charged the wrong card (*4264), which failed, while a valid backup card (*9395) was available and configured for autopayment. Accordingly, the February 2026 payment failure was caused or materially contributed to by Matterport's own billing system error, not solely by any act or omission of Plaintiff.

**53B.** Matterport Support Agent "Geoff," in email thread [01204216], made the following written admissions that are directly material to this action:

(a) **Established pattern of reinstatement:** "You have been granted that courtesy [reinstatement to Classic plan] multiple times in the past" — confirming that Matterport had established a consistent, repeated practice of reinstating Plaintiff's Legacy (Classic) plan following payment failures, and that such reinstatement was the expected course of conduct under the parties' relationship.

(b) **Classic plan discontinuation and repeated restoration:** "In May 2019, Matterport stopped offering what have since been known as Classic plans. We repeatedly restored you to be placed back into those plans, in the seven years since then." This admission confirms: (i) that Classic plans were formally discontinued by Matterport in May 2019; (ii) that Plaintiff was repeatedly restored to the Classic plan over the subsequent years despite the formal discontinuation; and (iii) that the established course of dealing included repeated reinstatement of the Classic plan.

(c) **Deliberate policy decision, not billing enforcement:** "We are not offering to put you back on classic. This decision does have one added benefit..." — confirming that Matterport's refusal to reinstate the Legacy Plan was a deliberate, affirmative corporate policy decision, not a routine or mechanical consequence of a billing enforcement rule.

(d) **Legal team on notice as of April 3, 2026:** "I have contacted our legal team and told them about this dispute. They will follow up with you or perhaps me very soon." (April 3, 2026) — confirming that Matterport's legal team was placed on actual notice of this dispute on or before April 3, 2026.

## IX. Matterport's Bad Faith and Pretextual Conduct

**54.** Matterport's refusal to reinstate the Legacy Plan following Plaintiff's immediate cure of the payment default was not a good-faith enforcement of a contractual right. It was a pretext — the use of a technical, immediately-cured payment default as a mechanism to accomplish what Matterport had attempted, and publicly abandoned, in January 2025: the forced elimination of Legacy Plan pricing.

**55.** The following facts, taken together, establish that Matterport's conduct was pretextual and in bad faith:

(a) **The January 2025 mass termination attempt.** Just fourteen months before the Termination, Matterport sent mass notices to all legacy/Classic plan holders announcing the cancellation of their plans. This was not a response to payment defaults; it was a blanket corporate effort to eliminate the legacy pricing tier. This attempt failed only due to industry-wide backlash and the Remley Promise.

(b) **The Remley Promise as a concealment of corporate intent.** CRO Remley's public retraction of the January 2025 termination notices was a tactical retreat, not an abandonment of Matterport's corporate objective. Matterport used the Remley Promise to pacify the Service Partner community while continuing to seek an alternative path to the same outcome.

(c) **The absence of a cure period.** Matterport's Platform Services Agreement contains no cure period for payment defaults. This structural omission — combined with Matterport's willingness to use a one-day payment default as a permanent termination trigger — is consistent with a deliberate corporate policy designed to seize on any payment irregularity as grounds for Legacy Plan elimination.

(d) **The immediacy of the cure.** Plaintiff cured the payment default within twenty-four hours of the Termination. Matterport's refusal to reinstate the Legacy Plan in response to a cure this rapid is commercially unreasonable and inconsistent with good faith.

(e) **The de minimis amount at issue.** The entire basis for the Termination was a single unpaid invoice of $62.62. The notion that a $62.62 payment shortfall on an approximately eight-year subscription account — cured within 24 hours — constitutes a material breach justifying permanent termination is commercially absurd absent a bad-faith motive.

(f) **The financial motive.** Matterport's parent company, CoStar Group, has a direct and substantial financial incentive to eliminate legacy

pricing inherited from Matterport's pre-acquisition subscription structure. Converting Plaintiff and other legacy plan holders to current plans at $200-$400 per month would represent a three-to-six-fold revenue increase per subscriber.

(g) **The industry-wide pattern.** Matterport's use of individual payment defaults to eliminate Legacy Plan subscriptions — following the failed mass termination attempt in January 2025 — reflects a systematic, coordinated corporate strategy, not an isolated contractual enforcement decision.

(h) **Matterport's own billing system caused or contributed to the payment failure.** As set forth in Paragraph 53A, Matterport's billing system charged Plaintiff's expired or declined card (*4264) while ignoring a valid, available autopay card (*9395). Matterport's invocation of a payment default as grounds for termination is further evidence of bad faith where its own billing infrastructure created or materially contributed to the very default it now claims as justification.

(i) **Matterport's own support agent admitted a pattern of reinstatement.** As set forth in Paragraph 53B, Matterport Support Agent "Geoff" admitted in writing that Plaintiff had been "granted that courtesy [reinstatement] multiple times in the past" and that Matterport had "repeatedly restored" Plaintiff to the Classic plan. Matterport's abrupt reversal of this established practice is direct evidence of bad faith.

56. The cumulative effect of these facts is to establish that Matterport's true motivation for refusing to reinstate Plaintiff's Legacy Plan was not the $62.62 payment default. The true motivation was Matterport's corporate objective — driven by CoStar Group's financial interests — to eliminate the legacy pricing tier by any available means, including the opportunistic exploitation of payment processing failures by aging, cognitively impaired small business subscribers.

**56A.** On April 10, 2026, Plaintiff was forced to pay $15.33 for a Matterport Starter plan — a plan permitting only 5 active Spaces — under economic duress, solely to prevent the complete loss of access to his account and Spaces in advance of a scheduled client shoot on April 12, 2026. This payment was not voluntary and does not constitute Plaintiff's acceptance of any new plan terms or his waiver of any right to reinstatement of the Legacy Plan.

**56B.** Plaintiff reserves the right to seek class certification pursuant to Fed. R. Civ. P. 23 on behalf of all similarly situated Matterport legacy/Classic plan holders who were subjected to the same pattern of pretext termination — i.e., the use of individual payment defaults, however minor or system-caused, as a mechanism to permanently eliminate grandfathered legacy pricing following Matterport's failed mass termination attempt in January 2025.

---

## COUNTS

---

## COUNT I

## BREACH OF CONTRACT

**57.** Plaintiff incorporates by reference Paragraphs 1 through 56B as though fully set forth herein.

**58.** Plaintiff and Matterport entered into a binding and enforceable subscription contract — the Legacy Plan — under which Plaintiff was entitled to host an unlimited or high number of Matterport Spaces for a fixed monthly fee of approximately $62.62, and Matterport was obligated to provide uninterrupted hosting and access to Plaintiff's Spaces in exchange for timely payment of that fee.

**59.** The Legacy Plan subscription agreement constitutes a valid contract supported by adequate consideration: Plaintiff's payment of monthly subscription fees in exchange for Matterport's provision of cloud hosting services and platform access.

**60.** Plaintiff has substantially and materially performed all obligations under the Legacy Plan subscription agreement for approximately eight years, paying all monthly subscription fees required under the plan. Plaintiff's payment on March 20, 2026 — the day after the Termination — fully cured the only outstanding balance and rendered Plaintiff's account current. Moreover, as set forth in Paragraph 53A, the February 2026 payment failure was caused or contributed to by Matterport's own billing system, which charged an unavailable card (*4264) while a valid autopay card (*9395) was available. Plaintiff's culpability for any payment default is therefore materially diminished or negated.

**61.** Under Connecticut law, a party's right to terminate a contract based on a breach by the other party is limited to material breaches — breaches that go to the essence of the contract and deprive the non-breaching party of the benefit of the bargain. A technical, de minimis, and immediately-cured payment default on an approximately eight-year subscription account does not constitute a material breach sufficient to justify contract termination.

**62.** Matterport materially breached the Legacy Plan subscription agreement in the following respects:

(a) Matterport terminated Plaintiff's Legacy Plan based on a single autopayment failure of $62.62 — a failure caused or contributed to by Matterport's own billing system error — cured within twenty-four (24) hours, without providing a meaningful cure period and in contravention of the parties' established course of dealing;

(b) Matterport refused to reinstate Plaintiff's Legacy Plan following Plaintiff's complete cure of the payment default on March 20, 2026, despite having confirmed receipt of full payment;

(c) Matterport forced Plaintiff onto an inferior subscription plan that fails to provide the hosting capacity, terms, and benefits promised under the Legacy Plan; and

(d) Matterport has placed at immediate risk of archiving or deletion the approximately 200 Spaces that Plaintiff is entitled to host under the Legacy Plan, threatening the permanent loss of Plaintiff's professional portfolio.

(e) Matterport, by refusing reinstatement of the Legacy Plan, coerced Plaintiff into paying $15.33 on April 10, 2026 under economic duress for a manifestly inadequate Starter plan, solely to prevent complete loss of account access before a client shoot on April 12, 2026.

63. As a direct and proximate result of Matterport's breach of contract, Plaintiff has suffered and continues to suffer damages, including:

(a) The value of the Legacy Plan benefits wrongfully withheld, calculated as the present value of the monthly cost differential between the Legacy Plan ($62.62/month) and the replacement plan required to host approximately 200 Spaces ($200-$400/month), over the remaining useful life of Plaintiff's business;

(b) The cost of the Starter Plan subscription forced upon Plaintiff, including the $15.33 payment made under economic duress on April 10, 2026;

(c) The value of the approximately 200 Spaces in Plaintiff's professional portfolio, including the lost revenue, client relationships, and goodwill associated with those Spaces if they are archived or deleted;

(d) Lost business revenue and client opportunities resulting from the interruption of Plaintiff's platform access; and

(e) Such other consequential and incidental damages as shall be proven at trial.

64. Plaintiff's damages under Count I exceed the jurisdictional threshold of $75,000 when the foregoing elements are aggregated over the remaining useful life of Plaintiff's business.

## COUNT II

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**65.** Plaintiff incorporates by reference Paragraphs 1 through 64 as though fully set forth herein, including specifically the admissions of Matterport Support Agent "Geoff" set forth in Paragraph 53B and the billing system failure set forth in Paragraph 53A.

**66.** Connecticut law implies a covenant of good faith and fair dealing in every contract. This covenant requires that neither party do anything that will injure the right of the other party to receive the fruits of the contract, and prohibits a party from exercising contractual discretion in an arbitrary, capricious, or bad-faith manner.

**67.** The Legacy Plan subscription agreement vested Matterport with contractual discretion in connection with, among other things, its decision whether to terminate the subscription for non-payment. The implied covenant required Matterport to exercise that discretion in good faith and in a manner consistent with the reasonable expectations of the parties.

**68.** Matterport breached the implied covenant of good faith and fair dealing by exercising its contractual discretion in bad faith. Specifically:

(a) Matterport used a technical, immediately-cured payment default of $62.62 — a default caused or contributed to by Matterport's own billing system — as a pretext to accomplish a corporate objective — the elimination of Legacy Plan pricing — that it had publicly promised not to pursue;

(b) Matterport deliberately refused to reinstate Plaintiff's Legacy Plan despite receiving full payment curing the default, when reinstatement would have cost Matterport nothing and was entirely consistent with the parties' approximately eight-year relationship;

(c) Matterport exploited Plaintiff's cognitive disabilities — which directly contributed to the autopayment failure — knowing that Plaintiff was a disabled veteran whose short-term memory impairments made administrative payment tracking difficult;

(d) Matterport's conduct was directly contrary to the express representations made in the Remley Promise;

(e) Matterport's conduct was motivated by the financial interest of its parent company, CoStar Group, in eliminating legacy pricing and maximizing subscription revenue; and

(f) Matterport, as admitted by its own support agent "Geoff," had repeatedly reinstated Plaintiff to the Classic plan following prior payment failures, and its abrupt reversal of that practice is direct evidence of bad faith.

**68A.** Matterport's own documented history of billing errors — including its unauthorized charge of over $1,000 to Plaintiff's debit card in May 2020, which required Plaintiff to escalate directly to the then-Chairman and CEO RJ Pittman, file a BBB complaint, and initiate bank disputes — makes Matterport's use of Plaintiff's 2026 payment failure as grounds for permanent termination a paradigmatic exercise of contractual rights in bad faith and with unclean hands.

**69.** The evidence of Matterport's bad faith is cumulative, corroborated, and specific: it includes the January 2025 mass termination attempt; the Remley Promise as a tactical retraction rather than a genuine policy change; the complete absence of any cure period in the subscription terms; Matterport's confirmed receipt of full payment within 24 hours of termination; and the industry-wide pattern of Matterport targeting legacy plan holders for plan elimination.

**70.** As a direct and proximate result of Matterport's breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered all damages set forth in Count I, together with any additional damages available under Connecticut law for bad faith breach, including but not limited to loss of the benefit of the bargain, economic harm caused by the pretextual termination, and consequential business losses.

---

## COUNT III

### FRAUDULENT INDUCEMENT

**71.** Plaintiff incorporates by reference Paragraphs 1 through 70 as though fully set forth herein.

**72.** Beginning in February 2018, Matterport's representative Brad Ewert (email: bewert@matterport.com; direct phone: (415) 851-4404) made specific and material representations of fact to Plaintiff as a condition of soliciting Plaintiff's enrollment as a Matterport Service Partner. The central misrepresentation was that Matterport would provide Plaintiff with three to four (3 to 4) qualified business leads per month as a benefit of Service Partner enrollment. Google Voice records preserved in Plaintiff's email archive confirm that Brad Ewert personally called Plaintiff on February 1, 2018 at 4:32 PM and left a subsequent voicemail on February 15, 2019.

**73.** Brad Ewert's representation was a statement of present fact and future commitment — not mere puffery or opinion. It was specific as to quantity (3 to 4 leads), frequency (per month), and quality (qualified). It was delivered in the

context of a formal sales solicitation by Matterport's representative, who had actual or apparent authority to make such representations on Matterport's behalf.

74. The representation was material. Plaintiff's decision to purchase the $4,000 Pro 2 camera and to commit to monthly subscription payments was directly predicated on the reasonable expectation of receiving qualified client referrals.

75. The representation was false when made. Matterport either had no operational program in place to deliver qualified leads to Service Partners at the time of solicitation, or had no genuine intent to fulfill the representation, or made the representation recklessly without any reasonable basis for believing it to be true.

76. Matterport knew, or had reason to know, that the representation was false. Matterport's failure to deliver a single lead over approximately ninety-six months is direct evidence that no such program existed at the time the representation was made, or that Matterport had no intention of delivering on the promise.

77. Plaintiff reasonably and justifiably relied on Matterport's representation. Plaintiff had no independent ability to verify Matterport's claimed lead-generation program or its capacity to deliver leads. Plaintiff's reliance was the foreseeable and intended result of Matterport's solicitation.

78. As a direct and proximate result of Matterport's fraudulent misrepresentation, Plaintiff suffered the following damages:

(a) The purchase price of the Matterport Pro 2 camera: approximately Four Thousand Dollars ($4,000.00);

(b) Approximately eight years (approximately ninety-six months) of Legacy Plan subscription fees paid in direct reliance on the promise of business leads, totaling approximately Six Thousand Eleven Dollars and Fifty-Two Cents ($6,011.52) (96 months × $62.62/month);

(c) Lost business revenue from the 3-4 qualified leads per month that were promised but never delivered, representing approximately 288 unfulfilled lead opportunities over eight years; and

(d) Such other consequential damages as shall be proven at trial.

**79.** Because Matterport's conduct was fraudulent — involving intentional misrepresentation or reckless disregard for the truth — Plaintiff is entitled to punitive damages under Connecticut law in an amount sufficient to punish Matterport for its fraudulent conduct and to deter similar conduct in the future.

## COUNT IV

## PROMISSORY ESTOPPEL

**80.** Plaintiff incorporates by reference Paragraphs 1 through 79 as though fully set forth herein.

**81.** The Remley Promise — made in writing by Matterport's Chief Revenue Officer, Jay Remley, on or about January 28, 2025, and specifically stating that "Classic plans are NOT being canceled" and that "As long as your payments are up to date, you will retain full access to your Classic plan" — constitutes a clear, definite, and unambiguous promise by Matterport that Plaintiff's Legacy Plan subscription would be maintained as long as Plaintiff's payments were current.

**82.** The Remley Promise was made by an authorized officer of Matterport — its Chief Revenue Officer — who had actual authority to bind Matterport with

respect to its subscription and pricing commitments to the Service Partner community.

**83.** The Remley Promise was directed to and received by Matterport's legacy/Classic plan subscribers, including Plaintiff, in the context of Matterport's retraction of the January 2025 mass termination notices.

**84.** Plaintiff reasonably and foreseeably relied on the Remley Promise in the following respects:

> (a) Plaintiff continued to pay his Legacy Plan subscription fees and to build his real estate photography business on the Matterport platform, rather than investigating or migrating to competing platforms;

> (b) Plaintiff invested in additional photography equipment — including a 360 X5 camera — to expand his Matterport-based service offerings;

> (c) Plaintiff refrained from taking any steps to download, preserve, or migrate his approximately 200 Spaces to alternative hosting platforms, because the Remley Promise gave him reasonable assurance that his Spaces were secure; and

> (d) Plaintiff structured and marketed his business services on the premise of continued Matterport platform access at Legacy Plan pricing.

**85.** Plaintiff's reliance on the Remley Promise was objectively reasonable. The Remley Promise was made in writing, by the CRO of Matterport, in direct response to the January 2025 termination scare, precisely for the purpose of assuring Service Partners that they could rely on the continuity of their Legacy Plans.

**86.** The operative condition of the Remley Promise — "as long as your payments are up to date" — was satisfied by Plaintiff's payment of the full outstanding balance on March 20, 2026, the day after the Termination. Plaintiff's account was "up to date" from March 20, 2026 forward. Matterport's refusal to honor the

Remley Promise — despite the operative condition being satisfied — constitutes a breach of the promise on which Plaintiff relied.

**87.** Injustice can only be avoided by enforcement of the Remley Promise. Plaintiff restructured his business, made capital investments, and forgore migration alternatives in direct reliance on Matterport's written assurance. To permit Matterport to now repudiate that assurance — based on a one-day payment default cured within 24 hours, and one caused or contributed to by Matterport's own billing system — would be to allow Matterport to profit from its own duplicity while Plaintiff suffers the permanent loss of an approximately eight-year business portfolio.

**88.** As a direct and proximate result of Matterport's breach of its promissory commitment and failure to honor the Remley Promise, Plaintiff has suffered damages including: the full value of the Legacy Plan; all business losses caused by the Termination; the lost value of alternative platforms and opportunities Plaintiff forgore in reliance on the Remley Promise; and all consequential damages flowing from Plaintiff's detrimental reliance.

---

## COUNT V

### UNJUST ENRICHMENT

#### (Pleaded in the Alternative)

**89.** Plaintiff incorporates by reference Paragraphs 1 through 88 as though fully set forth herein.

**90.** Plaintiff pleads this Count in the alternative to, and without waiving, his breach of contract claims in Counts I and II.

**91.** If, for any reason, this Court finds that no enforceable contract governs the parties' relationship with respect to the Legacy Plan, or that Matterport's termination was technically permitted under the subscription agreement,

Matterport has been unjustly enriched at Plaintiff's expense and equity requires restitution.

**92.** Over the approximately eight-year relationship, Plaintiff conferred substantial and measurable benefits on Matterport, including:

(a) Approximately eight years (approximately ninety-six months) of subscription fee payments totaling approximately Six Thousand Eleven Dollars and Fifty-Two Cents ($6,011.52);

(b) The creation, upload, and hosting on Matterport's platform of approximately 200 distinct three-dimensional Spaces;

(c) Plaintiff's role as a Service Partner actively promoting Matterport's technology, cameras, and platform to real estate clients in Connecticut and the surrounding region; and

(d) Plaintiff's purchase of $4,000 in Matterport hardware, directly supporting Matterport's equipment revenue.

**93.** Matterport has received and retained these benefits. Matterport now seeks to deny Plaintiff the benefit of the bargain that formed the basis for Plaintiff's conferral of those benefits — specifically, Plaintiff's right to host his approximately 200 Spaces on the Legacy Plan — while retaining the value of those benefits for itself.

**94.** It would be unjust and inequitable for Matterport to retain the benefits described in Paragraph 92 without either: (a) restoring Plaintiff's Legacy Plan on the terms originally agreed; or (b) providing Plaintiff with monetary compensation equivalent to the value of the Legacy Plan benefits permanently withheld.

**95.** Plaintiff is entitled to restitution of all benefits unjustly retained by Matterport, including all subscription fees paid (approximately $6,011.52), the pro-rated value of the $4,000 camera purchase attributable to Matterport's failure

to perform its obligations, and the equivalent monetary value of the Legacy Plan access permanently withheld.

---

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sanford B. Schupper respectfully requests that this Court enter judgment in his favor and against Defendant Matterport, LLC, and grant the following relief:

**1. Temporary Restraining Order and Preliminary Injunction.** Pursuant to Fed. R. Civ. P. 65, an Order: (a) Immediately reinstating Plaintiff's Legacy (Classic) Plan subscription on the terms existing prior to the March 19, 2026 Termination, at a monthly rate of $62.62; (b) Directing Matterport to preserve all approximately 200 Spaces in Plaintiff's account in their current state; (c) Enjoining Matterport from requiring Plaintiff to subscribe to any plan other than the Legacy Plan as a condition of maintaining access; (d) Enjoining Matterport from terminating, downgrading, restricting, or taking any adverse action without prior Order of this Court; and (e) Directing Matterport to implement and maintain a full litigation hold on all documents and data related to this matter.

**2. Permanent Injunction.** Following trial, a permanent injunction reinstating and preserving Plaintiff's Legacy Plan subscription, on Legacy Plan terms, for the remaining useful life of Plaintiff's business as a real estate photographer.

**3. Compensatory Damages.** An award of compensatory damages in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00), to be proven at trial.

**4. Restitution.** Restitution of all subscription fees paid by Plaintiff in reliance on Matterport's fraudulent inducement, in an amount not less than Six Thousand Eleven Dollars and Fifty-Two Cents ($6,011.52).

**5. Camera Restitution.** Return of, or monetary compensation for, the Matterport Pro 2 camera purchased by Plaintiff in reliance on Matterport's fraudulent promise of business leads, in the amount of Four Thousand Dollars ($4,000.00), plus any applicable depreciation adjustment to be determined at trial.

**6. Punitive Damages.** To the extent permitted by Connecticut law, an award of punitive damages sufficient to punish Matterport for its fraudulent inducement and bad faith breach of contract, and to deter similar conduct.

**7. Attorneys' Fees and Costs.** Plaintiff seeks mandatory attorneys' fees under Conn. Gen. Stat. § 42-110g(a) (CUTPA fee-shifting) and under any other applicable fee-shifting statute, contractual provision, or equitable doctrine. Plaintiff further seeks an award of all reasonable costs of this action.

**8. Pre- and Post-Judgment Interest.** An award of pre-judgment and post-judgment interest at the applicable rate on all monetary awards.

**9. Class Certification.** In the event Plaintiff elects to proceed on a class basis pursuant to Fed. R. Civ. P. 23, an Order certifying a class of similarly situated Matterport legacy/Classic plan holders subjected to the same pretext termination strategy.

**10. Consequential and Floor Plan Damages.** Damages for all consequential harms caused by Matterport's upload blockade, including the eight-day floor plan delay (April 12–20, 2026) that caused defective delivery to client Tara Hegarty, Hegarty & Company, Brookfield, Connecticut, including lost business, reputational harm, and the cost of corrective action.

**11. CUTPA Statutory Damages.** Pursuant to Conn. Gen. Stat. § 42-110g, actual damages, punitive damages not exceeding the greater of three times actual damages or $5,000 per violation, plus mandatory attorneys' fees and costs.

**12. Such Other and Further Relief.** Such other and further relief as this Court deems just, equitable, and proper under the circumstances.

---

## JURY DEMAND

Plaintiff Sanford B. Schupper hereby demands trial by jury on all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

---

## VERIFICATION

## STATE OF CONNECTICUT

## COUNTY OF FAIRFIELD

I, Sanford B. Schupper, being duly sworn, depose and say:

I am the Plaintiff in the above-captioned action. I have read the foregoing Verified Complaint and know the contents thereof. The factual allegations contained in the foregoing Verified Complaint are true and correct to the best of my knowledge, information, and belief. Where allegations are made upon information and belief, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America and the State of Connecticut that the foregoing is true and correct.

Executed this 11th day of April, 2026, at Brookfield, Connecticut.

_____

**SANFORD B. SCHUPPER**

Plaintiff, Pro Se

23 Old Bridge Road, Brookfield, Connecticut 06804

Telephone: (203) 941-0230

Email: brookfieldphotographer@gmail.com

_____

*[Notary block / jurat to be completed at time of execution, if required by the Court]*

**Subscribed and sworn to before me**

this _____ day of _____, 2026.

_____

Notary Public

My Commission Expires: _____

_____

**EXHIBITS TO VERIFIED COMPLAINT**

The following exhibits are incorporated by reference into this Verified Complaint and will be filed with the Court upon filing:

**Exhibit A:** March 20, 2026 Matterport "Payment Accepted" email (Invoice No. IN252455040405839)

**Exhibit B:** January 2025 CRO Jay Remley retraction letter to legacy plan holders

**Exhibit C:** April 10, 2026 Matterport "reactivation" email

**Exhibit D:** April 9, 2026 dashboard screenshot (Account: Starter 5; Active Space Usage: 91/5)

**Exhibit E:** April 9, 2026 Matterport checkout page screenshot (Starter Subscription, $14.00/month)

**Exhibit F:** March 23 through April 3, 2026 email thread with Matterport Support Agent Geoff

**Exhibit G:** Google Voice records — Brad Ewert voicemails, February 1, 2018 and February 15, 2019

**Exhibit H:** May 1, 2020 email from Sanford B. Schupper to Susan Jose (CC: RJ Pittman), subject: "Continued unauthorized use of my debit card"

**Exhibit I:** May 16, 2023 email from RJ Pittman (Chairman and CEO, Matterport) — Classic plan price increase with 30-day grace period

**Exhibit J:** April 12, 2026 Matterport upload-blocked email — "Your recent upload attempt requires an upgraded subscription plan"

**Exhibit K:** April 12, 2026 Matterport plan upgrade screenshot — Professional plan $296.00/month (373% over legacy rate)

**Exhibit L:** April 12, 2026 Matterport AI Assistant confirmation — archiving unavailable on Classic plans (Case #01219207)

**Exhibit M:** April 12, 2026 Matterport AI Assistant confirmation — $9.99 reactivation fee (198 × $9.99 = $1,976.02 to restore full portfolio)

**Exhibit N:** April 16, 2026 — Third forced upgrade: Business 100/Monthly, $344.27 charged Visa *9395, $355.00/month

**Exhibit O:** April 17–20, 2026 — Eight-day floor plan delay and defective room labels: order confirmation (April 17), delivery email (April 20), Plaintiff demand email to support (April 20)

**Exhibit P:** Connecticut Secretary of State Official Business Record — CoStar Realty Information, Inc. (ALEI 0610236): Active foreign/DE corporation; registered CT agent = Corporation Service Company, Goodwin Square, 225 Asylum Street, 20th Floor, Hartford, CT 06103; Gene Boxer listed as Corporate Secretary — confirming dual role disqualifying Mr. Boxer under Rule 3.7

---

*DRAFT — This document is a draft Verified Complaint prepared for attachment as Exhibit A to a pre-litigation demand letter. It has not been reviewed by admitted counsel and is not filed with any court. All factual allegations are based on information provided by Plaintiff and are subject to revision, correction, and supplementation prior to filing.*